UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
BUSINESS MANAGEMENT
INTERNATIONAL, INC.,                    :

                    Plaintiff,   :      **MEMORANDUM AND ORDER**

        - against -               :      05 Civ. 6738 (MHD)

LABYRINTH BUSINESS SOLUTIONS,     :
LLC, VALENTIN GVOZDEV and
WILLIAM KOPELCHECK,               :

                    Defendants.  :
-------------------------------x

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE:**

        Plaintiff Business Management International, Inc. ("BMI")
commenced this action against defendants Labyrinth Business
Solutions, LLC ("LBS") and Messrs. Valentin Gvozdev ("Gvozdev") and
William Kopelcheck under the Copyright Act of 1976, 17 U.S.C. §§
101 et seq. Plaintiff alleges that defendants infringed its
copyright of the "Andel Jewelry Code," which consists of software
modifications and programs created by BMI for Andel Jewelry, Inc.
("Andel"), and that they did so by copying the code, creating
derivative works from the code, and selling the code.

        The parties have each moved for summary judgment. For the
reasons that follow, we deny defendants' motion, and grant
plaintiff's motion in part and deny it in part.

1

## BACKGROUND

### I. The Evidentiary Record

We initially summarize the factual record before us, most of which is not in genuine dispute. To the extent that the record reflects such conflicts, we will note them.[1]

---

[1] Local Rule 56.1 requires a party filing for summary judgment to submit a statement of material facts "as to which the moving party contends there is no genuine issue to be tried." The party filing an opposition must also file a 56.1 statement containing "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" as well as any additional uncontroverted material facts. Each statement of material fact must be followed by a citation to admissible evidence. Under the Rule, these facts "will be deemed to be admitted . . . unless specifically controverted" by the opposing party.

In this case, defendants and plaintiff each filed a 56.1 statement, and defendants filed an additional 56.1 counter-statement with their reply. In their reply memorandum, defendants argue that plaintiff did not properly comply with Rule 56.1 because plaintiff's numbered responses do not correspond to defendants' original 56.1 statement, and because plaintiff incorrectly cites evidence that does not support its statements of material fact. (Defs.' Reply Mem. 8-10). Defendants argue that we may therefore accept the facts in their 56.1 statement as true or admitted. (Id. at 2-3, 8-10).

We decline to do so. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file [a 56.1] statement." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001); see also Cusack v. News Am. Mktg. In-Store Servs. L.L.C., 2008 WL 2663001, at *1 n.1 (S.D.N.Y. July 2, 2008). In this case, rather than deeming defendants' 56.1 statement admitted, we will consider all admissible evidence in the record.

2

BMI is a software consultant company that provides computer programming services. (Decl. of Larry Schiff, President of BMI ("Schiff Decl.") ¶ 3). It specializes in licensing, servicing, and customizing Microsoft Navision for its customers. (Id. ¶ 4). Microsoft Navision "is a Microsoft accounting software program that Microsoft licenses and distributes to companies such as BMI, who in turn install the product at third-party end-users and charge the end-users for" their services. (Aff. of Valentin Gvozdev ("Gvozdev Aff.") ¶ 3). BMI is an official Navision "reseller" or "licensor," and its customers are considered Navision "end-users" or "licensees." (Schiff Decl. ¶ 4, Ex. B). The contract between BMI and Microsoft authorizes BMI to customize Navision and to promote and distribute the resulting product. (Schiff Decl. Ex. A 383 ¶ 3.A).

In 2000, BMI replaced another software company, Computer Associates, Inc. ("CA"), as Andel's Navision developer. (Schiff Decl. ¶ 15, Exs. H-L).[2] At the time, Andel, a jewelry manufacturing

_____

[2] The chronology of events leading to BMI becoming Andel's Navision developer is not entirely clear. Schiff's declaration attaches two letters dated October 25, 2000: a letter from the CFO of Andel to BMI "formally request[ing]" Navision services (Schiff Decl. Ex. H), and a letter from BMI to Navision transferring Andel's Navision provider from CA to BMI. (Schiff Decl. Ex. I). In Gvozdev's reply affidavit, he states that BMI formally became Andel's Navision provider on November 1, 2000, but does not cite anything to support this statement. (Reply Aff. of Valentin Gvozdev ("Gvozdev Reply Aff.") ¶ 4).

3

company, was using the Navision program with modifications added on by CA. (Decl. of Laurel Loehlin, Vice-President of Operations and Director of Development of BMI ("Loehlin Decl.") ¶ 6; Gvozdev Aff. ¶ 7). In the years 2000 through 2002, BMI performed "consulting, analysis, documentation and programming work" for Andel, the value of which totaled over $570,000. (Loehlin Decl. ¶ 5; Schiff Decl. ¶ 20, Ex. O). This work included installing manufacturing modules and programming additional functionality into those modules. (Loehlin Decl. ¶ 6). Defendants assert that BMI did minimal programming for Andel, citing the invoices that BMI sent to Andel as well as BMI's time-keeping records, both of which mostly reflect charges for sales and support fees. (Defs.' Reply Mem. 5-6; Gvozdev Reply Aff. ¶¶ 6-9). In contrast, plaintiff claims that it did substantial programming work and that such tasks were regularly entered into timesheets and bills as "consulting" or other functions. (Pl.'s Reply Mem. 4; Reply Decl. of Laurel Loehlin ("Loehlin Reply Decl.") ¶¶ 4-7).

Defendant Gvozdev was employed by BMI from November 1999 through March 2002 as a computer programmer and later as Director of Manufacturing Services. (Gvozdev Aff. ¶ 2; Loehlin Decl. ¶ 4).

_____

However, the contract between BMI and Andel that Schiff submits, which is signed by an Andel representative, is dated five months earlier, April 26, 2000. (Schiff Decl. Ex. K). Confoundingly, the project proposal is dated after the contract, May 25, 2000. (Schiff Decl. Ex. J).

4

He was assigned to perform modifications and customizations of the Andel code (Gvozdev Aff. ¶ 6; Loehlin Decl. ¶ 4),[3] and performed the majority of BMI's work on the Andel account. (Schiff Decl. ¶ 20).

In or about March or April 2002, Gvozdev left BMI and began working directly for Andel. (Gvozdev Aff. ¶ 7; Schiff Decl. ¶ 21). Schiff asserts that "Gvozdev assured BMI that he would not be programming at Andel but rather he wanted a 'hands on job' in manufacturing." (Schiff Decl. ¶ 21). Gvozdev does not dispute this statement. However, after commencing his employment at Andel, Gvozdev continued to program and modify Navision for Andel. (Gvozdev Aff. ¶ 9; Schiff Decl. ¶ 23). Correspondingly, during this time BMI's work on the Andel code decreased: Schiff states that "BMI received very few requests for programming from Andel" (Schiff Decl. ¶ 22), while Gvozdev asserts that BMI ceased all programming work for Andel once he started working at Andel. (Gvozdev Aff. ¶ 8).

In or about April 2003, Gvozdev left Andel to start defendant LBS with another former BMI employee, defendant William Kopelcheck.

---

[3] Throughout this memorandum and order we use the term "Andel code" to refer generally to the Navision code customized for Andel, and not to a specific version of the code as it existed at a particular time. We note that BMI's copyright of the "Andel Jewelry Code" is one version of the general "Andel code."

(Id. ¶ 10; Schiff Decl. ¶ 26). LBS was established as a limited liability company on April 30, 2003, with Gvozdev and Kopelcheck as co-owners. (Decl. of Charles H. Knull ("Knull Decl.") Ex. C, Ex. H (Dep. of Valentin Gvozdev dated Mar. 23, 2007 ("Gvozdev Dep.")) 11).

LBS is also an official Navision developer, and markets the "LBS Jewelry Solution," a code consisting of modifications of Navision for jewelry manufacturing and distribution companies. (Gvozdev Aff. ¶¶ 10, 12; Schiff Decl. ¶ 29). It is thus a direct competitor with BMI. (Id.).

Schiff asserts that LBS began marketing the LBS Jewelry Solution to jewelry manufacturing companies in May 2003, even though, in his experience, "a jewelry manufacturing program normally takes a programmer two to three years to develop to the point of marketability." (Schiff. Decl. ¶ 30-31). BMI alleges in its complaint that LBS, Gvozdev, and Kopelcheck copied the Andel code, made the LBS Jewelry Solution as a derivative work from it, and sold the LBS Jewelry Solution for profit. (Compl. at 6-9).

Gvozdev disputes these claims. He states that he began developing the LBS Jewelry Solution while he worked at Andel, and worked on it for approximately six to eight months before he left

6

Andel for LBS. (Gvozdev Aff. ¶ 12; Gvozdev Dep. 57-58). Gvozdev asserts that the LBS Jewelry Solution "does not contain elements that were copied from . . . the modifications and customizations that BMI developed for Andel Jewelry, Inc." (Gvozdev Aff. ¶ 13).

Gvozdev continued to program Navision for Andel after he left Andel to work at LBS in April 2003. On September 15, 2003, LBS replaced BMI as Andel's Navision developer. (Schiff Decl. ¶ 27). In August 2005, Andel filed for bankruptcy and transferred its assets to Samuel Aaron, another jewelry manufacturing company. (Gvozdev Aff. ¶ 11; Decl. of James D. Cecil, former Director and CFO of Andel ("Cecil Decl.") ¶ 5). Samuel Aaron is an LBS client. (Cecil Decl. ¶ 8).

On December 2, 2004, BMI registered a copyright of the "Andel Jewelry Code," a version of the Andel code that was completed in 2002. (Aff. of Martin J. Murray, Esq. ("Murray Aff.") Ex. 2).

II. Contracts Between the Parties

Microsoft executes contracts with both its resellers and its end-users. (Schiff Decl. Exs. A-E). Thus BMI and Microsoft entered into a contract (Schiff Decl. Ex. A), and presumably Andel and

7

Microsoft also entered into a contract.[4] BMI and Andel also had a contract for BMI's services. (Schiff Decl. Ex. J).

Under the contract between BMI and Microsoft, as well as under the sample end-user agreements provided by plaintiff, Microsoft owns the copyright of the Navision program, and the end-user -- in this case, Andel -- does not hold copyrights or title to any part of the program. (Schiff Decl. Ex. A 383 ¶ 3.A, 386 ¶ 7; Schiff Decl. Ex. B ¶ 2.1). The contracts do not directly address the copyright ownership of the customizations made by the reseller/licensor, BMI. However, the contracts appear to suggest that BMI would own the copyright to any customizations or modifications, as the BMI-Microsoft contract states that BMI "shall be solely responsible for and bear any and all liability for Customizations" (Schiff Decl. Ex. A 383 ¶ 3.A), and the end-user agreement provides that "Microsoft or its licensors hold full copyright, title, and all and any other rights to the Program."

---

[4] Neither party provided a readable end-user license agreement between Andel and Microsoft. Schiff's declaration purports to attach a "copy of the Microsoft-Andel License through September 15, 2003," but the document contains a page of a list of different categories such as "Sales & Receivables" and "Inventory," and then continues for four pages as indecipherable symbols and characters. (Schiff Decl. Ex. L). In March 2009, plaintiff's counsel represented to the Court that it did not have a legible copy of this agreement.

The four sample end-user agreements provided by plaintiff are dated 2004, 2005, 2006, and 2007. (Schiff Decl. Exs. B-E). The relevant clauses in each are substantially similar.

8

(Schiff Decl. Ex. B ¶ 2.1). BMI President Larry Schiff confirms this implication concerning BMI's copyright interests in his testimony that "any modifications made to that program by or on behalf of the reseller are owned by that reseller." (Schiff Decl. ¶ 6). Defendants do not dispute this assertion.

The contract between BMI and Andel, in discussing the use of modifications provided by BMI, states that "[i]f software modifications are included in the Project, [Andel] is licensed to use the modification." (Schiff Decl. Ex. K 24). It further provides that Andel "shall keep all copies of the Modifications at the actual site(s) of use and in no other place (except that one backup copy may be kept at Client's usual location for storing backups)." (Id.).

Finally, the BMI-Microsoft contract also provides for "Continuity Protection for Customers," stating that:

> If [BMI] fails to perform its obligation to provide Professional Services to Customers using Customizations, the parties agree that Microsoft Business Solutions shall be entitled to 1) irrevocably, without charge and indefinitely, assign the right to provide Professional Services to Partner's existing Customers to another Partner and 2) grant to Microsoft Business Solutions an irrevocable, royalty-free worldwide and perpetual license to use, develop, modify, evaluate and license the Customizations only to the extent necessary to ensure that the existing Customers are serviced in a satisfactory matter.

(Schiff Decl. Ex. A 383 ¶ 3.C).

## III. Prior Proceedings

In 2004, BMI filed a complaint in New York State Supreme Court against Gvozdev, Kopelcheck, and LBS, and against Hjalti Reynisson and Johan Helgason, two other former BMI employees who left BMI to work for LBS and who are not named in this lawsuit. BMI claimed, inter alia, breach of employment contracts and unauthorized use of trade secrets. (Murray Aff. Ex. 1). After extensive discovery, defendants moved for summary judgment, and the Hon. Charles Edward Ramos, J.S.C., granted that motion on January 27, 2006. (Id. ¶¶ 8-9, Ex. 5).[5]

## IV. Present Proceedings

Plaintiff filed the complaint in the current action on July 27, 2005, alleging: (1) that defendants copied their copyrighted

---

[5] In the decision, Justice Ramos found (1) that a valid contract existed between BMI and Reynisson and Helgason, (2) that the restrictive covenants in employment agreements between BMI and Reynisson and Helgason are not enforceable, (3) that the intentional-interference claims should be dismissed, and (4) that BMI failed to demonstrate that its code is a trade secret, and failed to demonstrate that Reynisson and Heglason misappropriated those trade secrets. (Opinion of the Hon. Charles Edward Ramos, J.S.C., Index No. 602538/04, dated Jan. 27, 2006; Murray Aff. Ex. 5).

10

Andel Jewelry Code from the computer system at Andel onto LBS's computers, (2) that defendants created derivative works from the Andel Jewelry Code, (3) that defendants used the derivative works to demonstrate the program to potential customers for their own profit and advantage, and (4) that defendants Gvozdev and Kopelcheck authorized and assisted in the copying of the Andel Jewelry Code. (Compl. ¶¶ 21-35).

On January 4, 2007, before the conclusion of discovery but after plaintiff had produced its expert report, defendants filed a motion for summary judgment. In doing so, they argued: (1) that BMI's copyright is not valid because it fails to disclose that the code was a derivative work of Navision; (2) that the scope of BMI's copyright is limited, as it does not include any edits made by Gvozdev while he was employed either as an Andel employee or subsequently by LBS; and (3) that BMI's expert did not compare the LBS Jewelry Solution to the Andel Jewelry Code as created by BMI, but rather compared the LBS Jewelry Solution to the Andel code as modified by Gvozdev and LBS. Based on these assertions, defendants argued that BMI cannot demonstrate that defendants infringed on any copyrighted work.

At the close of discovery, on April 16, 2007, plaintiff filed its opposition to defendants' summary-judgment motion as well as a

11

cross-motion for summary judgment. Plaintiff argued: (1) that the scope of BMI's copyright includes all changes made to the Andel code until BMI was officially terminated as Andel's Navision provider on September 15, 2003, including those made by Gvozdev while he was an Andel employee; (2) that BMI's copyright encompasses all derivative works; and (3) that BMI's expert report shows that defendants copied BMI's copyrighted code.

Defendants filed a reply, reiterating their original arguments and also asserting: (1) that this court lacks jurisdiction to adjudicate plaintiff's claim because BMI's copyright registration does not include the work that BMI puts at issue; and (2) that none of the allegedly infringed Andel code is original, as those parts of the code are functional.

In plaintiff's final riposte, it argued: (1) that the copyrighted code is original; (2) that this court has jurisdiction because the copyright is valid; and (3) that in addition to illegally copying the Andel code, defendants also engaged in contributory copyright infringement by working on and modifying the infringing code.

12

**ANALYSIS**

## I. Summary Judgment Standard

The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986); see, e.g., Anderson, 477 U.S. at 255; Howley v. Town of Stratford, 217 F.3d 141, 150-51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see, e.g., Celotex, 477 U.S. at 322; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir. 2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322-23, 325; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). If the movant fails to meet its initial burden, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970); Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006); Celotex, 477 U.S. at 322; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). In doing so, the opposing party cannot

14

rest "merely on allegations or denials" of the factual assertions of the movant, Fed. R. Civ. P. 56(e); see, e.g., Amaker v. Foley, 274 F.3d 677, 680-81 (2d Cir. 2001), nor can it rely on its pleadings or on merely conclusory factual allegations. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. See, e.g., Celotex, 477 U.S. at 324; Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir. 1994).

In order to show a "genuine dispute" of material fact, the opposing party must demonstrate that there is sufficient evidence for a reasonable jury to find in its favor. Anderson, 477 U.S. at 248; Matsushita, 475 U.S. at 587; Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc., 473 F.3d 450, 455-56 (2d Cir. 2007) (citing Anderson, 477 U.S. at 249). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of [the] material disputed fact[s]," summary judgment must be denied. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983).

15

When the parties have filed cross-motions for summary judgment, "a district court is not required to grant judgment as a matter of law for one side or the other." Ricci v. DeStefano, 530 F.3d 88, 109-10 (2d Cir. 2008). Rather, in these circumstances "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Bronx Household of Faith v. Bd. of Educ. of the City of New York, 492 F.3d 89, 96-96 (2d Cir. 2007) (citing Hotel Employees & Rest. Employees Union, Local 100 v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002)).

## II. The Copyright Act

The Copyright Act of 1976 ("the Act") protects "original works of authorship fixed in any tangible medium of expression," including "literary works." 17 U.S.C. § 102. A computer program is considered a "literary work" for the purposes of the Act, see H.R. Rep. No. 94-1476, at 54 (1976), and is defined by the Act as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101.

16

III. Copyright Infringement Test

To sustain a claim of copyright infringement, a plaintiff must show: (1) "ownership of a valid copyright," and (2) "unauthorized copying of the copyrighted work." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991)); Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997). To show unauthorized copying, the plaintiff must demonstrate that (a) "the defendant has actually copied the plaintiff's work," and (b) "the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 110 (2d Cir. 2001) (internal quotations omitted); Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998). "Stated differently, a plaintiff must establish both that the defendant copied in the factual sense and that that copying, as a legal matter, constituted prohibited copyright infringement." O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd., 1999 WL 47191, at *2 (S.D.N.Y. Feb. 2, 1999).

To satisfy the first part of the unauthorized copying test, the plaintiff must prove actual copying by showing "probative similarity" between the allegedly infringing work and the original

17

work.[6] Castle Rock, 150 F.3d at 137. "In the context of deciding whether the defendant copied at all (as distinguished from whether it illegally copied), 'similarity' relates to the entire work, not just the protectible elements." Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123 (2d Cir. 1994). Absent direct evidence of actual copying, a plaintiff can prove this element through indirect evidence such as "access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." Castle Rock, 150 F.3d at 137; Jorgensen, 351 F.3d at 51.

If the plaintiff shows actual copying, he must then show "substantial similarity between the two works relating to the

_____

[6] Some cases have referred to this step as requiring a showing of "substantial similarity." However, in noting that "[c]opyright caselaw has caused considerable confusion by the use of the term 'substantial similarity' at two different points of the copyright infringement analysis," the Second Circuit has indicated that "the term 'probative similarity' should be used when referring to the initial burden of proving copying by establishing access and/or similarities," and that after a plaintiff shows copying, he must also "then show that the copying was unlawful by establishing 'substantial similarity' between the works at issue." Repp v. Webber, 132 F.3d 882, 889 n.1 (2d Cir. 1997); see also Castle Rock, 150 F.3d at 137.

Some courts have also collapsed the two steps of the test, holding that a plaintiff must show "(1) [that] the defendant had access to the plaintiff's copyrighted work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable material." Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir. 1992) (citing Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986)) (emphasis added); Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996).

18

protectible material." Repp, 132 F.3d at 889. To demonstrate substantial similarity, the plaintiff must show both "(i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than de minimis.'" Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 131 (2d Cir. 2003) (quoting Castle Rock, 150 F.3d at 137-38).

Substantial similarity is determined by the "ordinary observer test," which asks "if an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."[7] Yurman, 262 F.3d at 111; see Fisher-Price, 25 F.3d at 123 (focusing on "whether an ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other."); Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960). When an allegedly infringing work "contains both protectible and unprotectible elements, the test must be more discerning, excluding the unprotectible elements from

_____

[7] While sometimes courts use the "total concept and feel" test for judging copyright infringement, see Yurman, 262 F.3d at 111, this test does not apply "where the alleged infringement involves the verbatim and wholesale copying of original text," as in this case. Lynx Ventures, LLC v. Miller, 45 Fed. Appx. 68, 70 (2d Cir. 2002); City of New York v. Geodata Plus, LLC, 537 F. Supp. 2d 443, 455-56 (E.D.N.Y. 2007); see also Tufenkian, 338 F.3d at 134-35.

19

consideration." Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70 (2d Cir. 1999) (internal quotations omitted). This assessment "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998).[8]


IV. Assessment of the Motions


The arguments advanced on both sides in support of their respective summary-judgment motions reflect, not surprisingly, mostly mirror images of each other. We first assess defendants'

_____

[8] For a claim of copyright infringement of non-literal elements of a computer program such as the interface or structure, the Second Circuit uses the "Abstraction-Filtration-Comparison" test to analyze substantial similarity. In applying this test, the court "dissect[s] the allegedly copied program's structure and isolate[s] each level of abstraction contained within it," filters "protectable expression from non-protectable material," and then compares the remaining elements of the programs for substantial similarity. Altai, 982 F.2d at 706-11. The Altai test has been widely used by district courts and other circuits. See, e.g., Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004); Jacobsen v. Deseret Book Co., 287 F.3d 936, 943 n.5 (10th Cir. 2002); Torah Soft Ltd. v. Drosnin, 136 F. Supp. 2d 276, 284 (S.D.N.Y. 2001); Tradescape.com v. Shivaram, 77 F. Supp. 2d 408, 414-15 (S.D.N.Y. 1999). We do not discuss this test further here because plaintiff is claiming copying of the literal (written) elements of its code. We note that in analyzing the substantial similarity of the literal code, we essentially apply the steps of filtration and comparison in separating protectable code from non-protectable code, and then comparing the protectable code to the allegedly copied material. See eScholar, LLC v. Otis Educ. Sys., Inc., 2005 WL 2977569, at *23 (S.D.N.Y. Nov. 3, 2005).

argument of copyright invalidity and then turn to the various questions on which plaintiff's claim of unlawful copying turns.

## A. Copyright Validity

Defendants first argue that BMI's copyright is not valid because BMI made a misrepresentation on its Certificate of Registration. (Defs.' Mem. 13). They note that on the certificate for the Andel Jewelry Code, BMI did not respond to item 6, titled "Derivative Work or Compilation," which asks the registrant to "[i]dentify any preexisting work or works that this work is based on or incorporates." (Murray Aff. Ex. 2). Defendants argue that since the Andel Jewelry Code was a derivative work of the basic Navision software, BMI made a "misrepresentation or material omission," rendering the copyright invalid.[9] (Defs.' Mem. 14). We disagree.

Under the Act, a "certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). As

_____

[9] While defendants ultimately "assume the validity of BMI's copyright" for the purposes of the motion, they later assert this argument again as an affirmative defense in their response to BMI's summary judgment motion. (Defs.' Reply Mem.). We address this issue in full.

21

BMI started work on the Andel Jewelry Code sometime in 2000, its copyright registration in 2004 falls within the five-year time frame. Thus BMI's copyright certificate "creates a rebuttable presumption that the work in question is copyrightable." Fonar Corp. v. Domenick, 105 F.3d 99, 104 (2d Cir. 1997).

This presumption of validity may be overcome, in limited circumstances, by an omission of information in the certificate. An omission alone, however, is insufficient to invalidate a copyright. "Only the knowing failure to advise the Copyright Office of facts which might have occasioned a rejection of the application constitutes reason for holding the registration invalid," a principle known as the "innocent error rule." Eckes v. Card Prices Update, 736 F.2d 859, 861-62 (2d Cir. 1984) (internal quotations omitted); see also Malibu Textiles, Inc. v. Carol Anderson, Inc., 2008 WL 2676356, at *6 (S.D.N.Y. July 08, 2008); eScholar, 2005 WL 2977569, at *12. Defendants must therefore first "put forth . . . evidence that plaintiff's misstatement . . . was deliberate," as "[w]ithout the requisite showing of scienter, defendants cannot rebut the presumption of validity created by the registration." Tradescape.com, 77 F. Supp. 2d at 414-15; see also Whimsicality, Inc. v. Rubie's Costume Co., Inc., 891 F.2d 452, 455 (2d Cir. 1989) (finding that presumption of validity "may be overcome . . . by proof of deliberate misrepresentation"); cf. Serv. & Training, Inc.

22

v. Data Gen. Corp., 963 F.2d 680, 688-89 (4th Cir. 1992) (finding computer software copyright not invalid where there was no evidence that defendants intentionally failed to disclose the derivative nature of the work). Defendants must not only present evidence of scienter, but must also "show that the Copyright Office might have rejected the plaintiff's application if it had not made that misstatement." eScholar, 2005 WL 2977569, at *12; see also Fonar, 105 F.3d at 104. For example, defendants may present evidence that a work was not copyrightable at all because it was not original or was copied from the public domain. See Folio Impressions, Inc. v. Byer California, 937 F.2d 759, 763 (2d Cir. 1991).

Defendants do not claim that BMI intentionally withheld information from the Copyright Office, and they certainly have not offered any proof of a deliberate omission. More significantly, however, defendants have not shown that the work was not copyrightable because of its derivative nature, and thus they fail to demonstrate that the cited omission might have led to a rejection of the application.

A derivative work is defined in the Act as "a work based upon one or more preexisting works," including those "consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work." 17

23

U.S.C. § 101. Derivative works are copyrightable if they are sufficiently original.[10] See 17 U.S.C. § 102(a) ("Copyright protection subsists . . . in original works of authorship"); Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 782 (2d Cir. 1994).

The originality requirement for copyrights is a low bar, as the Supreme Court has held that "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist, 499 U.S. at 345. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily." Id.; see also Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) ("[T]he quantity of originality that need be shown is modest -- only a dash of it will do.").

It is undisputed that BMI wrote at least some original code in

_____

[10] We note that a derivative work "would be considered an infringing work if the material which it has derived from a preexisting work had been taken without . . . consent." Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 155 F. Supp. 2d 1, 23 n.37 (S.D.N.Y. 2001); see 1 Nimmer on Copyright § 3.01 (2008). However, whether or not BMI's work infringed on Navision's or CA's copyright is not at issue in this lawsuit, and even if it were, the BMI-Microsoft contract gave BMI express permission to modify Navision and the preexisting Andel code.

developing customizations and modifications for Andel after it took over as Andel's Navision developer in 2000, and that at least some portions of this code were written before 2002, the year the registered code was completed.[11] (Gvozdev Aff. ¶¶ 5-6; Schiff Decl. ¶¶ 15-20). This creation of new code is sufficient to meet the low bar for originality required by the Act. See, e.g., Mattel, Inc. v. Goldberger Doll Mfg. Co., 365 F.3d 133, 135 (2d Cir. 2004) (finding on summary judgment that the facts that a doll was "independently created" and that nothing in the record indicated that there was any lack of originality were "sufficient to justify copyright protection."). Given the originality of the work, the Andel Jewelry Code is copyrightable, and defendants cannot overcome the presumption of validity of the copyright. See, e.g., Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 220 F. Supp. 2d 289, 298 (S.D.N.Y. 2002) (finding that because Fox's X-Men logos contained the requisite degree of originality to be copyrightable

---

[11] In defendants' reply brief, they claim that "BMI's programming work for Andel was negligible." (Defs.' Reply Mem. 5). We do not view this assertion as an argument that BMI did not make any original modifications to the Andel code. Aside from the fact that such an argument would be improper as being first presented in a reply, in the preceding section of their brief defendants acknowledge that BMI developed a "newly upgraded system" for Andel, and that Gvozdev, while servicing the Andel account for BMI, "identif[ied] additional needs" for Andel and "identif[ied] requirements for additional modifications" to the Andel code. (Id. at 4-5). We also note that the parties agree that BMI performed at least twenty-four hours of programming work for Andel, although plaintiff claims that the amount of time was much greater. (Defs.' Reply Mem. 5-6; Pl.'s Reply Mem. 4; see p.4, supra).

as derivative works, "Fox's failure to identify its logos as derivative does not affect the validity of Fox's copyright registrations."). Plaintiff therefore has sufficiently demonstrated that its copyright is valid beyond a triable dispute.

## B. Unauthorized Copying

Defendants next argue that BMI failed to show unlawful copying, because (1) the scope of BMI's copyright includes only the elements of the Andel program that were authored by BMI, and not those elements authored by Gvozdev while at Andel or by LBS; and (2) BMI's expert compared the allegedly infringing LBS Jewelry Solution to the Andel code as it existed in 2005, after both Gvozdev and LBS had modified it, and thus BMI does not have a copyright in the code examined by the expert and any similarities that the expert found were meaningless. (Defs.' Mem. 14-19). Defendants further argue in their reply that only the specific version of the Andel Jewelry Code submitted at the time of the copyright registration -- a version completed in 2002 -- is protectable under BMI's copyright, and that therefore this court lacks jurisdiction to consider any claim regarding other parts of the code. They also argue that in any event, portions of the allegedly infringing code are functional and therefore not covered by copyright. (Defs.' Reply Mem. 20, 24).

26

In opposition to defendants' motion, plaintiff argues (1) that any modifications made to the Andel code until September 15, 2003, when LBS officially replaced BMI as Andel's Navision provider, were made under BMI's license and are thus covered by BMI's copyright; and (2) that BMI's expert did compare the LBS Jewelry Solution with the copyrighted Andel Jewelry Code and found similarities between the two. In support of its own motion, plaintiff argues that its expert found substantial similarity between the LBS Jewelry Solution and the copyrightable parts of the Andel Jewelry Code, thus establishing infringement. We address all of these arguments in our analysis of plaintiff's unauthorized-copying claim.

## 1. Probative Similarity

To establish unauthorized copying, as noted, BMI must first demonstrate probative similarity. It has done so.

Access is "an undisputed matter in this case." (Defs.' Reply Mem. 13). Indeed, Gvozdev had access to, and in fact worked on, the copyrighted Andel Jewelry Code as modified by BMI during his time working both as an employee of BMI and later as an employee of Andel.

In addition, BMI has shown similarities between some version

27

of the Andel code as authored by BMI and the LBS Jewelry Solution. Since this step of the analysis addresses whether there was any copying at all, "probative similarity" refers to the "entire work and not just the protectible elements." Fisher-Price, 24 F.3d at 123. The examples that plaintiff's expert, David Clausen, attaches to his expert report and to his declaration show many similarities between some version of the Andel Jewelry Code and some versions of the LBS Jewelry Solution, including similar language and phrases, misspellings, and internal references and notations, including notations of "BMI," "VG," and "BMIVGNY."[12] (Murray Aff. Ex. 6 ("Clausen Report") at 5-23; Decl. of David Clausen ("Clausen Decl.") Exs. C-Q). Defendants' own expert recognizes that Clausen identified code that existed in both some version of the Andel code modified by BMI and the code of LBS's clients. (Decl. of Leslie Rush ("Rush Decl.") ¶ 6).

Given the facts that Gvozdev clearly had access to the Andel Jewelry Code for a long period of time, and that both experts recognized similarities found between the Andel code as modified by BMI and the LBS Jewelry Solution, plaintiffs have established

---

[12] Loehlin states that all modifications to code at BMI should be marked by a comment area in which a programmer is "supposed to indicate 'BMI and their initials,' e.g. BMILGL." (Loehlin Decl. ¶ 7(b)). Since Gvozdev was the primary programmer working on the Andel code for BMI (Schiff Decl. ¶ 20), it is likely that "VG" refers to Gvozdev.

probative similarity beyond a triable dispute in this case.

## 2. Substantial Similarity

The main dispute between the parties concerns the second part of the unauthorized-copying test: whether the LBS Jewelry Solution is substantially similar to BMI's copyrighted Andel Jewelry Code. This step requires the court to use the ordinary-observer test to determine whether the works in question are substantially similar, while excluding the unprotectable elements of the works from its analysis. In determining whether there is a genuine issue of material fact regarding substantial similarity, we must examine (1) the scope of BMI's copyright, and (2) whether either side has shown beyond a triable dispute, primarily through their respective experts' reports, either (by plaintiff) that a protectable part of the Andel Jewelry Code was copied by defendants, or (by defendants) that no protectable part of the Andel Jewelry Code was copied by defendants.

### a. The Scope of BMI's Copyright

### i. Modifications to the Code at Different Times

The parties disagree as to which parts of the Andel Jewelry

29

Code are protected under BMI's copyright based on when the code was authored and who authored the code. We examine each argument in turn.

### (a) Code Written by CA

Under the Act, "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103; see Yurman, 262 F.3d at 109-10. Therefore only the original code that BMI authored is protected under its copyright of the Andel Jewelry Code, and BMI cannot claim copyright protection of any parts of the code authored by its predecessor, CA, while CA was Andel's Navision provider. The parties do not dispute this point.

### (b) Code Authored by BMI After 2002

Defendants assert that because BMI's registered copyright was for the "Andel Jewelry Code" completed in 2002, any claims that edits made to the code after 2002 are a copyright violation are not within the subject-matter jurisdiction of this court. (Defs.' Mem. 18; Defs.' Reply Mem. 20). Plaintiff disagrees, stating that "[t]he

30

registration certificate is a formality" and that they can claim infringement based on later programming. (Pl.'s Mem. 13; Pl.'s Reply Mem. 5). Defendants are correct.

The Act provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). This registration requirement limits a district court's subject-matter jurisdiction to claims arising from registered copyrights, and thus "the existence of a claim based on a registered copyright does not bring within a district court's jurisdiction all related claims stemming from unregistered copyrights." In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 116, 123 (2d Cir. 2007). Therefore, "registration of a claim on an original work does not create subject matter jurisdiction with respect to a suit for infringement of the original's unregistered derivative." Well-Made Toy Mfg. Corp v. Goffa Intern. Corp., 354 F.3d 112, 115 (2d Cir. 2003); see also Orange County Choppers, Inc. v. Olaes Enterprises, Inc., 497 F. Supp. 2d 541, 553 n.16 (S.D.N.Y. 2007) ("[A]n author of a derivative work cannot rely upon the registration of the copyright in the original and must therefore separately register a copyright in the derivative work.").

31

BMI registered only the 2002 version of the Andel Jewelry Code, and therefore only that version of the code is protected. Any edits or modifications to the code made after this 2002 version was completed would create a derivative work of the copyrighted version of the Andel Jewelry Code, see 17 U.S.C. § 101, and BMI would need to register the later versions of the code to have copyright protection for those new edits. Therefore BMI cannot claim copyright infringement for the copying of any edits or modifications that BMI made to the 2002 version of the Andel Jewelry Code between the date of registration in 2002 and 2005.

### (c) Code Written by Gvozdev and LBS After Gvozdev Left BMI

BMI argues that any modifications of the Andel code while BMI was Andel's Navision provider -- that is, until September 15, 2003 -- including modifications made by Gvozdev when he was at Andel, "were made 'by or on behalf' of BMI" because the programming was written "under" BMI's Navision license. (Pl.'s Mem. 8, 14; Schiff Decl. ¶ 25). It argues that those edits therefore fall under BMI's copyright of the Andel code and are owned by BMI. (Id.). Defendants dispute this assertion, arguing that "those elements that were created by successors to BMI (such as Valentine Gvozdev as an Andel employee, or LBS)" are not part of BMI's copyright. (Defs.' Mem. 14).

32

A copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). "As a general rule, the author [of a copyright] is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 102); see also Shaul v. Cherry Valley-Springfield Cent. School Dist., 363 F.3d 177, 185 (2d Cir. 2004); Carell v. Shubert Organization, Inc., 104 F. Supp. 2d 236, 247 (S.D.N.Y. 2000) (stating that authors are those who show "the existence of those facts of originality, of intellectual production, of thought, and conception.").[13]

There is no dispute about the fact that BMI did not author the modifications made to the Andel code by LBS or by Gvozdev while

_____

[13] One of the main exceptions to this "general rule" is "works for hire," which are defined as "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned . . ." 17 U.S.C. § 101. "[T]he employer or other person for whom the work was prepared is considered the author" of a work for hire. 17 U.S.C. § 201(b).

Neither Gvozdev's work while he was employed by Andel nor LBS's work fall into this exception, as Gvozdev was no longer employed by BMI at the time, and there is no indication that BMI ordered or had any sort of control over Gvozdev's and LBS's work during this time period. Cf. Logicom Inclusive, Inc. v. W.P. Stewart & Co., 2004 WL 1781009, at *8 (S.D.N.Y. Aug. 10, 2004) (finding "work made for hire" when, even though defendant was not an employee of a company, the work he did was "specially ordered or commissioned" through a contract for the work and assignments of making specific modifications).

33

employed by Andel. BMI does not cite any authority, aside from the declaration of one of its employees, for its assertion that it owns the copyright to work authored by another party, and there are no clauses in any of the relevant contracts that address the issue.[14]

    In sum, BMI does not own the copyright to any code written by others. This includes the code written by Gvozdev while employed by Andel, and the code written by LBS after it became Andel's Navision provider.

---

    [14] Schiff's declaration states that "[t]he agreement between BMI and Andel provided that all code written or created by BMI for Andel would remain BMI's property." (Schiff Decl. ¶ 24). He cites the BMI-Andel contract for this assertion. However, the paragraph he cites states:

    License: (a) If software modifications are included in the Project, Client is licensed to use the modification. The specific software (the Modifications), sites of use (if other than the address in this Agreement), and fees for license shall be described on Schedule A or Addendum. (b) Client shall keep all copies of the Modifications at the actual site(s) of use and in no other place (except that one backup copy may be kept at Client's usual location for storing backups).

There is no Schedule A or Addendum attached to the contract.

    Schiff's statement is unsupported, as neither this paragraph nor any other part of the BMI-Andel contract addresses the copyright ownership of code written by parties other than BMI.

ii. Code that Is Not Protected by Copyright

Defendants argue that "the allegedly infringed" code that BMI's expert identified is "not 'copyrightable' because [it] represent[s] stock features or industry standards or standard programming techniques," and is therefore functional and not "expressive and original." (Defs.' Reply Mem. 24-29). Plaintiffs dispute this assertion, arguing that the code is protected under its copyright. (Pl.'s Reply Mem. 3-4).

"It is settled that 'the literal elements of computer programs, i.e., their source and object codes, are the subject of copyright protection.'" Fonar, 105 F.3d at 104 (citing Altai, 982 F.2d at 702). "Source code" refers to the written words of a computer program. Altai, 982 F.2d at 698. "Object code" refers to "the binary language comprised of zeros and ones through which the computer directly receives its instructions." Id. The expert reports of both plaintiff and defendants compare the two codes' source codes. However, not all source code is subject to copyright protection. Three related doctrines -- the exclusion of functional elements from copyright protection, the merger doctrine, and the scenes a faire doctrine -- may apply in defining the scope of the application of BMI's copyright to the Andel Jewelry Code. We briefly summarize each before assessing the state of the record

35

pertinent to BMI's claim of unlawful copying.

### (a) Functional Elements

Functional elements of a computer program do not qualify for copyright protection. Altai, 982 F.2d at 714; see also Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 328 (2d Cir. 2005) (discussing "the notion that functional items are not eligible for the relatively long-term protections of copyright"); Procter & Gamble Co. v. Colgate-Palmolive Co., 1998 WL 788802, at *49 (S.D.N.Y. Nov. 9, 1998) (finding that "[f]unctional, utilitarian and mechanical aspects of works" are not protectable). "Functional" is a broad phrase often used by courts to mean elements dictated by efficiency or external factors that lack originality. See Altai, 982 F.2d at 707-10; Procter & Gamble, 1998 WL 788802, at *49 (finding a demonstration functional because its elements were "required by scientific aspects of the experiment and/or the need to depict the experiment clearly and in a very short period of time"). Sometimes the term as used also encompasses the merger doctrine and the scenes a faire doctrine, both discussed below.

The exclusion of functional elements from copyright protection is found in the Act, which states that copyright protection does

36

not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). As applied to computer programs, this bar means that "a commonplace or stock feature of . . . computer software . . . is not protectable." Torah Soft, 136 F. Supp. 2d at 290 (finding that expressing Biblical text in a matrix format is functional and therefore not protected).

(b) Merger Doctrine

"The merger doctrine bars a copyright of even original expression when there is essentially only one way to express an idea and thus the idea and its expression are inseparable." MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 194 (2d Cir. 2004) (internal quotations omitted). This doctrine is based on the principle that "where there is only one or so few ways of expressing an idea . . . protection of the expression would effectively accord protection to the idea itself." Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 146 n.6 (2d Cir. 1997); see also Baker v. Selden, 101 U.S. 99, 103-04 (1879).

For computer programs, "this means that when specific [parts of the code], even though previously copyrighted, are the only and

37

essential means of accomplishing a given task, their later use by another will not amount to infringement." Altai, 982 F.2d at 708 (quoting National Commission on New Technological Uses of Copyrighted Works, Final Report 1 (1979)). The Second Circuit also notes that "programmers generally strive to create programs that meet the user's needs in the most efficient manner" and that "the more efficient a set of modules are, the more closely they approximate the idea or process embodied in that particular aspect of the program's structure." Id. Thus, the court reasoned, "[w]hile, hypothetically, there might be a myriad of ways in which a programmer may effectuate certain functions within a program . . . efficiency concerns may so narrow the practical range of choice as to make only one or two forms of expression workable options," and "a court must inquire whether the use of [a] particular set of modules is necessary efficiently to implement that part of the program's process being implemented." Id. (internal quotations omitted). If so, "then the expression represented by the programmer's choice of a specific module or group of modules has merged with their underlying idea and is unprotected." Id.; see eScholar, 2005 WL 2977569, at *25 (finding no merger for data warehouse design and data models in educational software programs); Torah Soft, 136 F. Supp. 2d at 290 (finding that expression of displaying multiple finds in a single matrix merges with the idea of using software to ascertain alleged coded messages contained in

38

the Hebrew Bible).

### (c) Scenes a Faire Doctrine

"Scenes a faire are unprotectible elements that follow naturally from a work's theme rather than from an author's creativity." MyWebGrocer, 375 F.3d at 194. "For example, [f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction. As such, they are not copyrightable except to the extent they are given unique -- and therefore protectible -- expression in an original creation." Id. (internal quotations omitted).

In the context of computer programs, "programmers often must employ standard techniques to write a program that performs certain functions, and thus the scenes a faire doctrine often applies." eScholar, 2005 WL 2977569, at *25 (citing Altai, 982 F.2d at 709). As with the merger doctrine, practical and extrinsic considerations often dictate the use of such standard techniques, such as "(1) the mechanical specifications of the computer on which a particular program is intended to run; (2) compatibility requirements of other programs with which a program is designed to operate in conjunction; (3) computer manufacturers' design standards; (4)

39

demands of the industry being serviced; and (5) widely accepted
programming practices within the computer industry." Altai, 982
F.2d at 709-10.


## b. Evidence of Substantial Similarity


To decide the question of substantial similarity, a trier of
fact would first have to determine which parts of the Andel Jewelry
Code are protectable, and then compare that code with the LBS
Jewelry Solution. We first briefly summarize the main evidence that
each side submits in support of their respective motions -- the
expert reports. We then examine whether these reports show that the
protectable parts of the Andel Jewelry Code are substantially
similar to the LBS Jewelry Solution. Based on those expert reports,
we will consider whether either party has demonstrated an absence
of a genuine issue of material fact with regard to substantial
similarity.


## i. Expert Reports


During discovery, plaintiff submitted an expert report from
Clausen, a professional software engineer. (Clausen Report 2). He
examined two versions of the "Andel program": (1) "a snapshot of
the [Andel] program's sourcecode taken on or about March of 2002"

40

and (2) a version of the program retrieved from an Andel hard drive including changes made up through November 2005. (Id. at 4). He compared these programs to twenty versions of the LBS Jewelry Solution that "arrived on CD-ROM [from defendants] without much explanation as to their origin or history," which he later clarified included (1) the LBS Jewelry Solution from 2005, (2) a database customized for Samuel Aaron Jewelry Company, an LBS client, and (3) a database customized for Tache Jewelry Company, another LBS client. (Id.; Clausen Decl. ¶ 6(c)). When comparing the codes for evidence of copying, he stated that he excluded the standard Navision code from his analysis. (Clausen Report 4; Clausen Decl. ¶ 3).

Clausen concluded that "the sourcecode of the LBS program . . . contains a significant number of sections which were not provided by Microsoft [as part of the basic Navision program] and which are identical or very similar to portions of the Andel program [and that] . . . . [b]ecause of the substantial size of these sections and the preciseness of the similarities, I believe the only way this code could have found its way into the LBS program was through direct file copying." (Clausen Report 2-3). Clausen cites numerous sections of the "Andel program" and the "LBS program" that contain similar or even identical code, including portions that have the same misspellings and internal references, and some that contain

41

numerous notations of "BMI" and "Andel."[15] (Id.).

It is unclear, however, which Andel code and which LBS code Clausen compared in his report. While listing the examples of copying, he references "the Andel sourcecode," "the Andel program," and code "originally created by either BMI or CA and later enhanced at Andel," but he does not say whether he is using the snapshot of the code from 2002, or the version from 2005.

Clausen's declaration discusses additional parts of the codes that are similar and that he had not mentioned in his initial report. In doing so, he notes similarities in labeling custom fields, object and field numbers, misspellings, internal references, and notations of "BMIVGNY." (Clausen Decl. ¶¶ 26-31). When making these comparisons, Clausen states that he compared the "BMI Code" with "LBS Jewelry Solution" but he again does not specify the year or date of the codes used for each example. Since, however, he states at the beginning of the declaration that the two versions of the Andel code used in his analysis were the "BMI Andel Jewelry Manufacturing code dated 2002 (the one submitted for copyright registration)" and the "Andel Jewelry Manufacturing code

---

[15] Clausen also concluded that Gvozdev made continuous and significant enhancements to the Andel code after he left BMI, a conclusion that, regardless of its accuracy, is not determinative of copyright infringement, as discussed supra.

42

copied from Andel's computer system in the possession of Andel's Trustee in Bankruptcy" (id. ¶ 6), it is possible that by "BMI Code" he was referring specifically to the Andel code authored by BMI as of 2002.

Not surprisingly, defendants' expert, Leslie Rush, a Navision developer, disagrees with Clausen's principal findings. She examined (1) the BMI copyrighted code from 2002, (2) LBS's current version of the LBS Jewelry Solution, and (3) another LBS database (Aff. of Sarah Kickham Ex. C (Dep. of Leslie Rush) 6-7, 19), and concluded that "there are no substantial similarities between the two [codes] that would indicate a copying of the code." (Clausen Decl. Ex. B ("Rush Report") 2). She finds that "Mr. Clausen has not produced any examples of code that exist in BMI's Code [the Andel Jewelry Code registered in December 2005] and also exist in the LBS Jewelry Solution," and claims that Clausen incorrectly compared parts of the Andel code that BMI did not write with the LBS Jewelry Solution. (Rush Report 1-2). She states, "[a]ll that [Clausen] found is the totally inconsequential fact that LBS drafted code for Andel and in doing so accessed and modified BMI Code." (Id.). She also stated that she was unable to locate any of the examples of copying in Clausen's report in the versions of the code that she was examining for her report. (Id. at 3-9).

43

For all of the examples of copying cited in Clausen's report, Rush also found either that the code identified was functional and not a unique expression, that it was unclear who had drafted the allegedly copied code, or that some of the allegedly copied code was created solely for upgrade purposes.[16] (Id.).

Clausen's declaration takes issue with Rush's analysis, stating that many parts of the code are creative and not purely functional, that much of the code has markers attributing authorship to BMI or modification dates that correspond to the period when BMI was Andel's Navision provider, and that the code was not used solely for upgrade purposes. (Clausen Decl. ¶¶ 14-20). Clausen also asserts that the copied code that he found was in fact present in the registered version of the Andel Jewelry Code and the LBS Jewelry Solution, and that Rush's conclusion of noninfringment was inaccurate because she did not examine the respective versions of the code in their entirety. (Id. ¶¶ 7-12, 23).[17]

_____

[16] Gvozdev repeats some of these conclusions in his affidavit, stating that "the purportedly infringed material consists of functional programming components that are commonplace and standard in the computer industry, and their pure functionality is obvious." (Gvozdev Reply Aff. ¶ 12, 14-23).

[17] Clausen also concludes that the discrepancies between the code he examined and the code Rush examined indicated that defendants had "scrubbed" their code -- that they had deleted infringing parts of the code before submitting it to him -- because Rush mentions specific objects that do not exist in the version of the LBS Jewelry Solution that he examined. (Clausen Decl. ¶¶ 7-12; Clausen Reply Decl. ¶¶ 2-5). Both Rush and Gvozdev

44

Clausen's declaration listing additional examples of asserted copying triggered a further response from Rush. She maintains that Clausen "has not identified any code written by BMI that is original, unique or creative that also exists within the LBS Jewelry Solution package itself." (Rush Reply Decl. ¶ 5).

ii. Parties' Arguments Regarding Copying

Defendants' primary argument in support of their motion is that Clausen did "not use the relevant 2002 'snapshot' code for comparison purposes," and instead compared the LBS Jewelry Solution to the Andel code as enhanced both by Gvozdev while employed at Andel and by LBS. (Defs.' Mem. 16). They contend that because Clausen did not compare the LBS code to a version of the code that

respond to this accusation by saying that Clausen was comparing an earlier version of the LBS Jewelry Solution to a version that was later modified and enhanced. Therefore, they argue, the later edited version necessarily contained additional code that was not in the earlier version. (Rush Reply Decl. ¶ 3; Gvozdev Reply Aff. ¶ 24). Clausen did not directly respond to this explanation in his reply declaration.

Neither party raised this issue during discovery, and plaintiff's briefs only mention the issue in passing. (Pl.'s Mem. 12; Pl's Reply Mem. 8). Clausen does not even seem sure of his conclusion, stating that he "think[s] it is quite reasonable to assume" that the code was scrubbed (Clausen Decl. ¶ 12), and that purposeful scrubbing is "[t]he only explanation [he] can think of" for the discrepancy between the codes. We do not address this issue further, for these reasons and because Rush's and Gvozdev's explanations regarding this issue are logical, particularly in light of the fact that neither expert makes clear what version of the LBS Jewelry Solution he (or she) is examining.

was fully copyrighted, but rather compared it to code that LBS itself had written in part when it was Andel's Navision provider, his comparison is "meaningless" and "irrelevant." (Id. at 18). They further argue that "the allegedly infringed reports and forms, assuming arguendo that they were copied, are not 'copyrightable' because they represent stock features or industry standards or standard programming techniques."[18]

---

[18] Defendants also argue that some of the Andel code exists in the Navision code of LBS client Samuel Aaron because Andel transferred its assets to Samuel Aaron when it became bankrupt. (Defs.' Reply Mem. 22-23). Cecil states that when Andel sold its product line to Samuel Aaron, one of Andel's own programmers -- an individual named Ash Adnandani -- transferred "certain reports and forms from Andel's database and set up user menus," and that Andel had purchased the rights to these reports and forms from Microsoft, although Cecil cites no evidence for the latter statement. (Cecil Decl. ¶ 9). Rush's expert report also states that some of the copying that Clausen found was attributable to the fact that Samuel Aaron purchased Andel's code from Andel. (Rush Report 2-3; see also Gvozdev Reply Aff. ¶¶ 14-20).

Plaintiff responds that Navision licenses cannot be transferred from a company that has gone bankrupt to another company, and that regardless, defendants are still liable for infringement by permitting the Andel code to be transferred to a new location and copied onto a new system. (Pl.'s Mem. 9; Pl.'s Reply Mem. 10). Plaintiff cites the "Microsoft Business Solutions Transfer Policy," which provides that an end-user is prohibited under the contract from transferring or assigning the right to use its version of Navision, and the Microsoft Transfer Policy, which prohibits, inter alia, transfers of a license (1) to an employee of a licensee company if that employee leaves the company, and (2) to another company if the licensee company goes bankrupt or tries to sell the software outright. (Schiff Decl. Ex. G).

Neither party has submitted further information on this issue. Given the lack of clarity as to what parts of the Andel code are protectable under BMI's copyright, we do not reach this separate issue of whether these transfers were allowed under

46

Plaintiff responds by arguing that it owns the copyright to part of the code written after 2002, and that even if it does not, its expert found numerous examples of copying from the 2002 copyrighted version of the Andel Jewelry Code into the LBS Jewelry Solution. (Pl.'s Mem. 11-12). It further asserts that the code is fully copyrightable. (Id.). In sum, plaintiff asserts that "[t]here is . . . no question that the Andel program has been copied for use and profit elsewhere without BMI's permission." (Id. at 14).

### iii. Genuine Issues of Material Fact Regarding Substantial Similarity

"Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 977 (2d Cir. 1980) (internal citations omitted); see also eScholar, 2005 WL 2977569, at *27; Torah Soft, 136 F. Supp. 2d at 282. "Whether one work infringes another 'is generally resolved by the fact-finder's prediction of the probable reaction of a hypothetical ordinary observer.'" eScholar, 2005 WL 2977569, at *27 (citing Durham Indus., Inc. v. Tomy Corp., 630 F.2d 905, 911 (2d Cir. 1980)). However, summary judgment for non-

---

contract and whether they violated BMI's copyright. We also note that the would-be wrongdoers in the improper transfer of the code -- Andel and its employees -- are not parties to this lawsuit.

47

infringement is appropriate "[i]f the similarity concerns only noncopyrightable elements of [a copyright holder's] work, or no reasonable trier of fact could find the works substantially similar." Matthew Bender & Co., Inc. v. West Pub. Co., 158 F.3d 693, 705 (2d Cir. 1998); see Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986).

There clearly exist genuine issues of fact, the resolution of which are material to whether the copyrighted Andel Jewelry Code and the LBS Jewelry Solution are substantially similar. Most crucially, the parties' experts disagree about the key issue of which parts of the Andel Jewelry Code are functional or otherwise exempt from copyright protection by the merger or scenes a faire doctrine. In addition, there appears to be a question as to whether, in finding copying, plaintiff's expert was comparing defendants' code with the plaintiff's copyrighted code or with a later version that included non-protectable materials.

We start with the clash of experts, who directly contradict each other on whether the elements of the plaintiff's code supposedly copied by defendant are protected creative elements. To take one example, one of Clausen's examples of copying was the similarity between the language used in the "External Purchase Order" forms in the codes. (Clausen Report 8-9). Addressing this

48

example, Rush states that these forms were not "unique expression" and that "[p]urchase orders are a standard type of report required by businesses, and businesses commonly utilize computer programs to generate purchase orders, which consist of a display of captions and data arranged on a printed page" and that the form "is based upon a standard Navision functionality." (Rush Report ¶ 7; Rush Decl. ¶ 7). Clausen disagrees, stating that the forms are "complex" with "[m]any acts of unique creative expression," and that they contain "business workflow logic which has nothing to do with the visual appearance of the purchase order, and is not part of the standard functionality provided by Microsoft," and that parts of the code "transform the underlying data and/or synthesize data from multiple fields." (Clausen Decl. ¶ 15; Clausen Reply Decl. ¶ 19).

Clausen and Rush also disagree as to the protectability of other elements of the Andel Jewelry Code. For example, Rush found that certain objects and tables that Clausen claims were copied are copies or derivatives of standard Navision objects and therefore not unique expression (Rush Report ¶ 4), while Clausen claims that the modifications of these objects are significant and relevant to copyright infringement. (Clausen Decl. ¶ 16, 26). In another example, Rush opines that other elements that Clausen claims were copied were actually used only for the temporary purpose of performing an upgrade and were meant to be removed (Rush Report ¶¶

49

8-11), while Clausen contends that they were not used for upgrades, and that "the entire program would cease to function if" the objects were removed. (Clausen Decl. ¶ 17). Clausen acknowledges this dispute in his reply declaration, stating, "my conclusion about all of these so-called 'upgrade' objects is that I cannot state definitively how they were used. I cannot disprove Defendants' claim, nor can I confirm it," although he goes on to say that regardless, he believes that the items are entitled to copyright protection. (Clausen Reply Decl. ¶ 14). Rush also notes in her declaration that while she had worked ten years as a Navision developer, Clausen does not have any practical experience with Navision and could not distinguish unique code from functional code when asked in his deposition. (Rush Decl. ¶¶ 4, 7).

These examples show genuine disputes of material fact as to (1) whether any of the allegedly copied code is functional as a stock feature of software, (2) whether the merger doctrine applies because the code in question is one of the only workable ways of expressing an idea or task for jewelry manufacturers in the Navision program, and (3) whether the scenes a faire doctrine applies because the code in question is using standard techniques in light of the Navision program, the demands of the jewelry manufacturing industry, or widely accepted programming practices. The parties have presented conflicting evidence regarding the

50

protectability of any of the allegedly copied code under these doctrines.

Furthermore, the experts also disagree about which parts of the code were written by which author. The basis for defendants' motion is their assertion that the relevant copyrighted 2002 version of the Andel Jewelry Code was not used as a basis of comparison in Clausen's report or declaration, and that the version he used was in fact edited by Gvozdev and LBS and therefore not part of BMI's copyright. (Defs.' Mem. 16-19; Defs.' Reply Mem. 22-23). As noted, however, it is not entirely clear what version of the Andel code Clausen compares in his report, and it is possible that he used the 2002 version as a basis of comparison for the additional similarities he found in his declaration. Also, even if Clausen compared a later version of the Andel code to the LBS Jewelry Solution, that fact would not foreclose the possibility that he found copying of the protectable parts of that later version -- the parts that were authored by BMI prior to 2002.

Rush also asserts that for certain examples Clausen lists in his report, "even when [Clausen] does find elements of BMI's Code in subsequent codes, he fails to show that the particular code from the BMI Code was drafted by BMI as opposed to Computer Associates or an Andel employee." (Rush Report 3). Clausen does cite to

51

"several examples where the authorship of copied code can be conclusively attributed to BMI" based on comments in the code, citing notations of "BMI" and "BMIVGNY" that appear to indicate the author of certain parts of the code. (See, e.g., Clausen Decl. ¶¶ 12, 20, 28-29). These notations do not exist, however, for all parts of the code he identified as having been copied, and, as noted, it is unclear whether these parts are functional, and whether they were written prior to the copyright registration in 2002. Since code authored by Computer Associates, by Gvozdev while employed by Andel, or by LBS, as well as any code authored by BMI for Andel that is not part of the registered 2002 version of the Andel Jewelry Code, are not protectable, the parties are in dispute as to whether the alleged examples of copying pertain to portions of the code covered by BMI's copyright.

In sum, there are significant disagreements between the experts as to the protectability of the parts of the Andel Jewelry Code allegedly copied in the LBS Jewelry Solution. Furthermore, even if plaintiff showed actual and direct copying of the copyrighted Andel Jewelry Code, there are disputes as to whether the copied portions of the code are functional or otherwise not protectable, in which case there is no infringement. See, e.g., Torah Soft, 136 F. Supp. at 290 (discussing merger doctrine and finding that "not all copying bars application of the merger

52

doctrine. Otherwise, the merger doctrine would stand for nothing more than the fundamental principle that independent creation is never infringement."); Merritt Forbes & Co. Inc. v. Newman Inv. Secs., Inc., 604 F. Supp. 943, 951 (S.D.N.Y. 1985) (finding that "where an underlying idea may only be conveyed in a more or less stereotyped manner, duplication of that form of expression does not constitute infringement, even if there is word for word copying," and that "the requisite originality may be missing"); Decorative Aides Corp., Inc. v. Staple Sewing Aides Corp., 497 F. Supp. 154, 157 (S.D.N.Y. 1980), aff'd, 657 F.2d 262 (2d Cir. 1981) (finding that where code is not protected by copyright, defendant, "although admitting to access and use of [plaintiff's] work, did not infringe [plaintiff's] copyright.").

Additionally, there is no indication that the two experts even examined the same code, since for all of the examples cited in Clausen's report, Rush asserted that she did not find the code he cited in either the Andel Jewelry Code or the LBS Jewelry Solution. Although plaintiff has presented evidence that part of a version of the Andel code exists in a version of LBS Jewelry Solution, there is a genuine dispute as to whether these parts came from the copyrighted version of the BMI-authored Andel Jewelry Code, as well as what part of the Andel Jewelry Code is protectable by the BMI copyright. Since defendant has not shown beyond triable dispute an

53

absence of protected material, and since plaintiff has not shown beyond triable dispute that defendants engaged in copying protected material, we deny both parties' motions for summary judgement on the issue of substantial similarity.

We also deny summary judgment on plaintiff's claims that defendants are liable for contributory copyright infringement and creation of a derivative work from copyrighted material, as those issues cannot be determined without a prior finding of whether the code in question was protected by copyright.

## CONCLUSION

For the foregoing reasons, defendants' summary judgment motion is denied, and plaintiff's summary judgment motion is granted on the elements of (1) ownership of a valid copyright and (2) probative similarity, and denied in all other respects. The parties are to appear before the undersigned for a pretrial conference on April 6, 2009, at 3:00 p.m. in Courtroom 17D, 500 Pearl Street, New York, New York 10007-1312. Any requests for adjournment of this scheduled conference must be in writing, with copies to all other parties, and must be preceded by reasonable efforts by the requesting party to obtain the consent of those parties.

Dated:     New York, New York
           March 24, 2009

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been mailed
this day to:

Charles H. Knull, Esq.
Sarah Kickam, Esq.
Ullman, Shapiro & Ullman, LLP
299 Broadway, Suite 1700
New York, NY 10007

Martin Joseph Murray, Esq.
Law Offices of Martin J. Murray
475 Park Avenue South, 25th Floor
New York, NY 10016